**ROYAL AMERICAN MANAGERS, IN-CORPORATED, Plaintiff–Appellant,**

v.

**IRC HOLDING CORPORATION and Joseph Ambriano, Defendants–Appellees, Cross–Appellants,**

**Gerald Dolman, Defendant–Appellee, Cross–Appellee.**

**Nos. 954, 955, 956, Dockets 88–7987, 88–9041, 88–9083.**

United States Court of Appeals, Second Circuit.

Argued April 3, 1989.

Decided Sept. 1, 1989.

Edward J. Boyle, New York City (Jeffrey A. Sims, Wilson, Elser, Moskowitz, Edelman & Dicker, New York City, of counsel), for plaintiff-appellant.

Ellen R. Nadler, New York City (Kramer, Levin, Nessen, Kamin & Frankel, New York City, of counsel), for defendant-appellee, cross-appellee Gerald Dolman.

John W. Mitchell, New York City (Karen F. Silverman, Arie Bucheister, La Rossa, Mitchell & Ross, New York City, of counsel), for defendants-appellees, cross-appellants IRC Holding Corp. and Joseph Ambriano.

Before PRATT and MINER, Circuit Judges, and MOTLEY, District Judge.*

MINER, Circuit Judge:

Plaintiff-appellant Royal American Managers, Inc. ("RAM") appeals from a judgment entered in the United States District Court for the Southern District of New York (Metzner, J.) dismissing claims grounded on section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder, 15 U.S.C. § 78j(b) (1982) & 17 C.F.R. § 240.10b–5 (1988); section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(2) (1982); and common law fraud. RAM instituted this action against IRC Holding Corporation ("IRC"), Joseph A. Ambriano (an officer and director of IRC), and IRC's attorney, Gerald Dolman, after purchasing 49% of the stock of Interamerica Reinsurance Corporation ("Interamerica"), a New York-licensed reinsurance company wholly owned by IRC. RAM alleged that the purchase was based upon certain misrepresentations made by Dolman and Ambriano, one to the effect that prior approval of the transaction by the New York State Insurance Department ("NYSID") would be unnecessary. RAM contended also, and maintains on appeal, that the purpose of the transaction has been frustrated because prior approval of NYSID in fact was required and not obtained.

The claims were dismissed by the district court, some at the close of evidence for lack of proof, some in conformity with a jury verdict, and some by decision of the court after the verdict. *See Royal American Managers, Inc. v. IRC Holding Corp.,* [1988–1989 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 94,091, at 91,095, 1988 WL 112881 (S.D.N.Y. Oct. 20, 1988). On appeal, RAM contends that the district court erred in: (1) dismissing for lack of proof the section 10(b), section 12(2) and common law fraud claims brought against Dolman; (2) refusing to permit amendment of the pleadings to include a claim against Dolman for professional malpractice; (3) deciding without submitting to the jury the section 12(2) claims against IRC and Ambriano; and (4) finding that IRC and Ambriano were not vicariously liable under section 12(2) for Dolman's alleged misrepresentations. In addition, IRC and Ambriano appeal from the district court's dismissal of their cross-claim against Dolman for malpractice, in the event any of RAM's claims against them are reinstated.

We affirm.

## BACKGROUND

In the spring of 1984, RAM became interested in purchasing a company in the insurance or reinsurance business. Discussions ensued between James R. Wining, who was RAM's Vice–Chairman, and Ambriano of IRC regarding the possible sale by IRC of the issued and outstanding capital stock of Interamerica. By October, Willie A. Schonacher, Jr., RAM's Chairman and Chief Executive Officer, entered into the discussions.

Wining and Schonacher met with Ambriano on October 8, 1984, whereupon Wining proposed purchasing 50% of the stock. Ambriano rejected this proposal on the grounds that (1) he did not wish to relinquish control and (2) such a deal would require prior approval of NYSID, since a 50% transfer might constitute a "change of control" of Interamerica, *see* N.Y. Ins. Law § 1506(a)(2) (McKinney 1985).[1] Ambriano

---

* Hon. Constance Baker Motley, United States District Judge, Southern District of New York, sitting by designation.

1. Section 1506 provides in pertinent part:

(a) No person, other than an authorized insurer, shall acquire control of any domestic insurer, whether by purchase of its securities or otherwise, unless:

wished to avoid the prior-approval process, which could span nine months. It was decided that the parties should contact Dolman—attorney for IRC and director and executive committee member of Interamerica—to discover if prior approval would be required. Although RAM had access to its own counsel, namely Frank J. Ross, Jr., Ambriano pointed out that Dolman previously was employed by NYSID and in that capacity was instrumental in drafting the regulations pertinent to the inquiry. Soon after the October 8 meeting, Wining telephoned Dolman, who opined that a 50% sale might require prior approval of NYSID, but that a 49% sale would not.

On October 30, 1984, Ambriano and Dolman met with Wining, Schonacher and Ross to prepare for the sale of the 49% stake. At that meeting, Dolman mentioned his former employment at NYSID and again stated he was of the opinion that prior approval was unnecessary. Ambriano allegedly represented that certain nominees of RAM would participate in the directorship and management of Interamerica.[2] Dolman and Ross left the meeting early, after which RAM agreed in principle to purchase the 49% interest in the corporation. Accordingly, the attorneys prepared the instruments needed to effect the transfer.

All the parties met at a final meeting in December 1984. Ambriano complained that the terms of the sale agreement drafted by Ross did not reflect the terms expressed by the parties in the previous meeting. When Ross began to raise questions about the transaction, Ambriano demanded that the attorneys leave. The attorneys departed as requested, and at the ensuing meeting of Ambriano, Schonacher and Wining only, the representations made earlier allegedly were repeated.

RAM ultimately purchased 49% of the stock for $3.75 million. NYSID soon learned of the purchase and informed Dolman that prior approval was necessary. It based its view on section 1501(a)(2) of the New York Insurance Law, which provides that "control shall be presumed to exist if any person directly or indirectly owns, controls or holds with the power to vote ten percent or more of the voting securities of any other person." N.Y. Ins. Law § 1501(a)(2) (McKinney 1985). Dolman replied to NYSID that, in his opinion, the "presumption" of 1501(a)(2) was overcome, because a sale of 49%, with 51% retained by the seller, did not constitute a change of control and thus did not require prior approval.

NYSID neither accepted nor rejected the sale, but instead repeatedly requested information of RAM. At first, RAM provided some information, but by the fall of 1985 it ceased to reply to NYSID's requests, and asked that the matter be put on hold.

The impasse with NYSID has not as yet been resolved, and the alleged promises of participation in directorship and management have not been fulfilled. At all times up to the commencement of this action, RAM has retained ownership of the purchased stock.

RAM commenced this action against IRC, Ambriano and Dolman, seeking principally damages and rescission of the sale and alleging that all three defendants committed securities fraud—in violation of section 10(b), Rule 10b–5 promulgated thereunder, and section 12(2)—and common law fraud. IRC and Ambriano cross-claimed against Dolman for malpractice, seeking "contribution from Dolman in the event RAM recovers a judgment against [IRC] and/or Ambriano." Both the amended

. . . .
(2) it receives the superintendent's prior approval.
N.Y. Ins. Law § 1506(a)(2) (McKinney 1985).

**2.** These representations, allegedly repeated by Ambriano throughout the negotiations and relied upon by RAM, were that: (i) Wining, Schonacher and Ross would be appointed to the Interamerica Board of Directors; (ii) an executive committee consisting of Wining, Schonacher and Ambriano would be formed to direct the affairs of Interamerica; and (iii) RAM would play a role in the management of Interamerica and earn a portion of Interamerica's commissions. The determinations made by the court and jury as to the claims based on these representations are not challenged on appeal.

complaint of RAM and the amended answer of IRC and Ambriano contained a demand for jury trial.

A trial by jury eventually took place. Apparently, only RAM called witnesses. Near the close of RAM's case, and thus near the end of trial, RAM sought to amend its complaint to add a claim of professional malpractice against Dolman. The district court denied the motion. The court then granted an oral motion to dismiss all of RAM's claims against Dolman for lack of proof. RAM immediately renewed its motion to amend the complaint, which the court again denied.

Only the claims for relief against IRC and Ambriano grounded on section 10(b) and common law fraud were submitted to the jury. Counsel for RAM did not object that the section 12(2) issues were withheld from the jury. The jury determined that neither IRC nor Ambriano violated section 10(b) or committed common law fraud by the supposed misrepresentations. The district court, as finder of fact, then dismissed the remaining section 12(2) claims, finding that the representations were not made negligently and that Ambriano was exonerated because he reasonably relied on the expertise of IRC's attorney, Dolman, as to the prior approval issue.

Judgment was entered, and this appeal timely ensued.

## DISCUSSION

RAM contends that the district court erred in dismissing its claims against Dolman and in not allowing an amendment of its pleadings to include the claim of malpractice. As to its claims against IRC and Ambriano, we note that RAM does not challenge the jury's determinations; nor does it challenge the correctness of the district court's determinations on the merits of the section 12(2) claims grounded on Ambriano's alleged misrepresentations. Rather, RAM urges that the section 12(2) claims brought against IRC and Ambriano should have been submitted to the jury, and that, if not, the district court should have found IRC and Ambriano vicariously

liable under section 12(2) for Dolman's alleged misrepresentations.

1. *Dismissal of the claims against Dolman*

RAM attributes to Dolman only misrepresentations regarding prior notification: that prior notification under the insurance law was unnecessary and that he would nonetheless notify NYSID of the transaction. Exactly when and how Dolman made the purported representation that he would notify NYSID is unclear. We hold that the district court properly dismissed these claims for failure of proof.

### (a) *Section 10(b)*

Section 10(b) and Rule 10b–5 provide for damages in a case involving a face-to-face affirmative misrepresentation when the following elements are met: (1) damage to plaintiff, (2) caused by reliance on defendant's misrepresentations or omissions of material facts, or on a scheme by defendant to defraud, (3) made with scienter (i.e., an intent to deceive, manipulate or defraud, or possibly with reckless disregard), (4) in connection with the purchase or sale of securities, and (5) furthered by defendant's use of the mails or any facility of a national securities exchange. *See Bochicchio v. Smith Barney, Harris Upham & Co.*, 647 F.Supp. 1426, 1429 (S.D.N.Y.1986); *see also* T. Hazen, *The Law of Securities Regulation* § 13.4, at 457–61 (1985 & Supp.1988).

A showing of reliance may be defeated, however, where defendant establishes that plaintiff should have *discovered* the true facts. *See Hirsch v. du Pont*, 553 F.2d 750, 762–63 (2d Cir.1977); 5A A. Jacobs, *Litigation & Practice Under Rule 10b–5* § 64.01[b][ii], at 3–353 to 3–359 (2d ed. 1988 rev.). This has been called the due diligence test, to which, traditionally, a negligence standard has applied. *See, e.g., Manufacturers Hanover Trust Co. v. Drysdale Securities Corp.*, 801 F.2d 13, 22 n. 7 (2d Cir.1986), *cert. denied*, 479 U.S. 1066, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987). Since our decision in *Mallis v. Bankers Trust Co.*, 615 F.2d 68 (2d Cir.1980), *cert. denied*, 449 U.S. 1123, 101 S.Ct. 938, 67

L.Ed.2d 109 (1981), however, the degree of diligence to which plaintiffs are held has been diminished to minimal diligence. More specifically, a plaintiff bears only the burden of negating its own "recklessness," once the issue of diligence is raised by defendant. *See id.* at 79 & n. 10; *see also Manufacturers Hanover Trust,* 801 F.2d at 22.

■ It is clear that RAM did not act with even the minimal diligence necessary to avoid the imputation of recklessness. RAM was controlled by businessmen with knowledge of, and many years of experience in, the insurance business. Equally as important, RAM was represented throughout the negotiations by its own attorney, Ross, a partner in a major Kansas City law firm that included attorneys experienced in insurance matters.

Significantly, each party had access to all relevant information and hence the opportunity to detect the "fraud." The sole representation of importance here concerns a statute, or more specifically, an *interpretation* of a statute. We note also that there was no concealment here; it was, in fact, Ambriano and Dolman who brought the statute to the attention of Wining, Schonacher and Ross. All Ross had to do was consult the statute (he concedes that he did not) and draw his own legal conclusion. Alternatively, he could have contacted officials at NYSID regarding their understanding of the statute. The transaction, after all, involved $3.75 million, certainly a sizeable sum. Under the circumstances revealed here, plaintiff's diligence "fell far short of the mark," *Hirsch,* 553 F.2d at 763.

### (b) Common law fraud

■ The claim against Dolman grounded on common law fraud suffers from similar defects. For a claim based on a false representation to be successful under New York law, the plaintiff must have relied on the representation and such reliance must have been justifiable. 60 N.Y.Jur.2d *Fraud & Deceit* § 142, at 650 (1987). Where the representation relates to matters that are not peculiarly within the other party's knowledge and both parties have available the means of ascertaining the truth, New York courts have held that the complaining party should have discovered the facts and that any reliance under such circumstances therefore would be unjustifiable. 60 *id.* § 143, at 654; *Mallis,* 615 F.2d at 80. Moreover, "[d]ecisions holding that reliance on misrepresentations was not justified are generally cases in which plaintiff was placed on guard or practically faced with the facts." *Mallis,* 615 F.2d at 81 (citing cases).

Any reliance by RAM would have been unjustifiable. As previously noted, the prior-notification representation concerned a statute that both parties were aware of, and, even more important, the interpretation of that statute. *See Verschell v. Pike,* 85 A.D.2d 690, 691, 445 N.Y.S.2d 489, 491 (2d Dep't 1981) (mem.) (attorney not justified in relying upon adversary's statement that lease was legal under zoning ordinance). The representation here thus pertained to matters not peculiarly within Dolman's knowledge, both parties equally had available the means of ascertaining the actual requirements relating to notification, and RAM clearly was placed on guard.

### (c) Section 12(2)

■ Unlike section 10(b), section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l* (2), is available against only the *seller* of securities.[3] The term "seller" was defined by the Supreme Court in *Pinter v. Dahl,*

---

3. The statute states in pertinent part:
   Any person who ... offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him ....

   15 U.S.C. § 77*l* (2) (1982).

486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988), as the "owner who passed title, or other interest in the security, to the buyer for value," *id.* at ——, 108 S.Ct. at 2076, or a "person who successfully *solicits* the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner," *id.* at ——, 108 S.Ct. at 2079 (emphasis added). The Court warned that a broader definition was undesirable because it "might expose securities professionals, such as accountants and lawyers, whose involvement is only the performance of their professional services." *Id.* at ——, 108 S.Ct. at 2081. Although *Pinter* was a section 12(1) case, we have held that its rationale applies to section 12(2) claims as well. *Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir.1988). Moreover, after *Pinter*, there is no separate aider and abettor liability under section 12. *Wilson v. Saintine Exploration & Drilling Corp.*, 872 F.2d 1124, 1127 (2d Cir.1989).

In his capacity as attorney or as a director or executive committee member of Interamerica, the company whose stock changed hands, Dolman clearly is not a seller. First, he was not an owner who passed title. IRC was the owner of record, and there is no assertion that IRC held the stock on behalf of Dolman. Second, IRC, not Dolman, initiated the negotiations, and thus solicited the sale. *See Pinter*, 486 U.S. at ——, 108 S.Ct. at 2079. In addition, it was Ambriano, and not Dolman, who proposed the 49%–51% structure of the sale in order to retain a controlling interest and avoid the delay of the prior approval process, and it was Ambriano who communicated these desires to Wining. Dolman did not even attend critical meetings, and of those he did attend, he left the first one early, after approximately one-half hour, and was dismissed from the final meeting. Furthermore, he did not "earn a commission from an actual seller for persuading [the buyer] to make a particular investment," *Wilson*, 872 F.2d at 1127. Although Dolman was a director and executive committee member of Interamerica, it is apparent that Ambriano ran the company; the record reveals that the executive committee never met, and there is no indication in the record that

the Board of Directors ever met. Accordingly, the district court did not err in dismissing for lack of proof the section 12(2) claim brought against Dolman.

### 2. *Amendment of the pleadings to include the malpractice claim*

■ The district court, in denying RAM's motion to conform the pleadings to the proof, *see* Fed.R.Civ.P. 15(b), did not abuse the broad discretion it has in these matters. *See Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921, 928–29 (2d Cir. 1987); *id.* at 929 (Mahoney, J., concurring); *Browning Debenture Holders' Comm. v. DASA Corp.*, 560 F.2d 1078, 1086 (2d Cir. 1977). The "most important question" in considering the propriety of granting such a motion

> is whether the new issues were tried by the parties' express or implied consent and whether the defendant "would be prejudiced by the implied amendment, i.e., whether he had a fair opportunity to defend and whether he could offer any additional evidence if the case were to be retried on a different theory."

*Browning*, 560 F.2d at 1086 (quoting 3 J. Moore, *Moore's Federal Practice* ¶ 15.13, at 993 (2d ed. 1966)).

The motion at issue here was made at the tail end of plaintiff's case, despite plaintiff having known for over three years the facts on which its legal malpractice claim was predicated. This raises the specter of prejudice to Dolman, which is not mooted by the existence in this case of IRC's cross-claim against Dolman for malpractice. That cross-claim (1) was contingent on RAM proving that Ambriano and IRC were liable to it—an event Dolman reasonably could believe might not occur—and (2) did not involve the issues of privity and lack of attorney-client relationship present in the claim RAM sought to assert against Dolman. Had RAM's motion been granted at the start, Dolman might have retained an expert to testify whether, in the opinion of the expert, Dolman's conduct vis-a-vis RAM "fell below the ordinary and reason-

able skill and knowledge commonly possessed by a member of his profession," *Entelisano Agency, Inc. v. Felt*, 135 A.D.2d 1096, 1096, 523 N.Y.S.2d 314, 314 (4th Dep't 1987) (mem.), *appeal denied*, 71 N.Y.2d 804, 524 N.E.2d 149, 528 N.Y.S.2d 829 (1988), *cert. denied*, ⸺ U.S. ⸺, 109 S.Ct. 1351, 103 L.Ed.2d 819 (1989). Additionally, Dolman might have prepared and proffered evidence on the "underlying relationship between the parties," in particular, to deny that "the bond between [the parties was] so close as to be the functional equivalent of contractual privity," *Ossining Union Free School District v. Anderson*, 73 N.Y.2d 417, 419, 539 N.E.2d 91, 91, 541 N.Y.S.2d 335, 335 (1989). Opening statements already were made and crucial witnesses had testified. Because RAM's "tardiness was inexcusable," we cannot say "it would [not] be prejudicial to force [Dolman] to defend against the new claim at such a late date." *Hirsch*, 553 F.2d at 758 n. 7 (reasoning of *Hirsch* district court).

### 3. *Section 12(2) issues not submitted to the jury*

RAM complains that its section 12(2) claims against IRC and Ambriano should have been submitted to the jury along with its other claims. This argument, however, is presented for the first time on appeal. RAM did not object at the trial when the district judge stated his intention to determine the claim. In fact, RAM did not object at any time during the conference at which the court discussed with counsel a draft of questions that were to be submitted to the jury. Furthermore, RAM submitted to the court a proposed charge, and there is no indication from the record that this charge requested any questions unique to the section 12(2) claim.

█ We are thus confronted with the question whether a failure to object and an acquiescence in nonjury proceedings constitutes a waiver of the right to a jury trial. Rule 39(a)(1) of the Federal Rules of Civil Procedure provides in pertinent part that when trial by jury has been properly de-

manded, waiver by the parties or their attorneys of record may be made "by an oral stipulation made in open court and entered in the record." Furthermore, the right to jury trial may be waived by conduct of the parties. 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2321, at 102 (1971). Indeed, the majority of our sister circuits that have addressed the question have held that participation in a bench trial without objection constitutes waiver of the jury trial right. *Compare Wool v. Real Estate Exchange*, 179 F.2d 62, 63 (D.C.Cir. 1949) (per curiam) (waiver), *United States v. 1966 Beechcraft Aircraft Model King Air*, 777 F.2d 947, 950–51 (4th Cir.1985) (waiver), *Southland Reship, Inc. v. Flegel*, 534 F.2d 639, 643–45 (5th Cir.1976) (waiver), *Lovelace v. Dall*, 820 F.2d 223, 227–29 (7th Cir.1987) (per curiam) (waiver) *and Smith v. Cushman Motor Works*, 178 F.2d 953, 953–54 (8th Cir.1950) (waiver) *with Palmer v. United States*, 652 F.2d 893 (9th Cir.1981) (no waiver).

We agree with the majority rule. It would be "patently unfair" and, "in effect, [an] 'ambush [of the] trial judge' on appeal" if appellant were allowed "to lodge an early demand for a jury," participate in a bench trial without objection, and then assign as error the failure to honor the jury demand. *1966 Beechcraft*, 777 F.2d at 951 (quoting *Palmer*, 652 F.2d at 897 (Chambers, J., dissenting)). Of course, a party should not be held, by reason of its participation in the nonjury proceedings, to have waived the jury trial right unless the party was "on notice that the trial court was planning to adjudicate the dispositive issues of fact." *Id.*

Our decisions in *Gargiulo v. Delsole*, 769 F.2d 77 (2d Cir.1985), and *DeGioia v. United States Lines Co.*, 304 F.2d 421, 424 & n. 1 (2d Cir.1962), are not to the contrary. In both those cases, the parties *did* object in the district court to the court's failure to conduct the trial by jury. In *Gargiulo*, we cited the *Palmer* decision merely to indicate that the objections were sufficient to preserve the jury trial right. *See* 769 F.2d

at 79. Similarly, in *DeGioia*, there was in fact a jury trial. *See* 304 F.2d at 424.

On the facts of this case, we have no hesitation in saying that RAM waived any right to a jury trial it possessed. It was no secret that the district court was going to determine the issues germane to the section 12(2) claim; the court made quite clear its intention on this matter. Moreover, RAM was represented throughout the proceedings by competent counsel, who were well aware of which questions were to be submitted to the jury. Simply stated, counsel for RAM had plenty of opportunities to voice any objections.[4]

### 4. *Vicarious liability of IRC and Ambriano for Dolman's actions*

RAM argues that the district court erred in failing to attribute to IRC and Ambriano the negligent misrepresentations of Dolman, as the agent of IRC and Ambriano, for purposes of establishing the section 12(2) liability of IRC and Ambriano. RAM did not raise this issue at the district court, however, and so it failed to preserve its claim for appeal. *See Mallis*, 615 F.2d at 79.

In any event, the district court did not err in dismissing the claim. No liability lies under section 12(2) where the defendant "did not know, and in the exercise of reasonable care could not have known, of [the alleged] untruth or omission." 15 U.S.C. § 77*l*(2). The general principles of vicarious liability do not preempt this "reasonable care" defense. *See Demarco v. Edens*, 390 F.2d 836, 841–43 (2d Cir.1968). In *Demarco*, for instance, the principal and its officers received the benefit of this defense, even though their alleged agents— an underwriter and individuals associated with it who were taking public the purported principal—were found by the trial court

to have violated section 12(2). *See id.* at 838–40.

In the case at bar, the district court found "that Ambriano did not know that prior approval was necessary and, in the exercise of reasonable care, could not have known that such approval was necessary." We find no fault with this determination. Indeed, the facts here call even more strongly for a determination of no liability than the facts in *Demarco* because Dolman, the supposed "agent," is not himself liable under section 12(2). Moreover, it is clear that Dolman was not the agent of IRC or Ambriano in their business dealings with RAM. *See Demarco*, 390 F.2d at 843–45. Dolman had no "apparent authority to bind [IRC or Ambriano]." *Id.* at 843. Rather, Ambriano ran the negotiations and made the decisions.

### 5. *Cross-claim of legal malpractice*

Because IRC and Ambriano are not liable in this case, there is no need to address their cross-claim for legal malpractice, since it is contingent on their direct liability.

## CONCLUSION

The judgment of the district court is affirmed.

---

**4.** Even if we were to decide that RAM preserved its jury trial right, we would hold that the district court did not err in deciding the section 12(2) issues on its own. "Section 12(2) is explicit in allowing the plaintiff no choice of remedy. If plaintiff owns the stock, he is entitled to rescission but not damages." *Wigand v. Flo-*

*Tek, Inc.*, 609 F.2d 1028, 1035 (2d Cir.1979). At the commencement of this action RAM still owned the stock. An equitable claim such as rescission is for the court, not the jury, to decide. *See Krinsk v. Fund Asset Management, Inc.*, 875 F.2d 404, 414 (2d Cir.1989).